DIETZ v. DIETZ & WATSON Good morning, may I please report, Robert Andrews here on behalf of Appellants Jig Pack and Neal Means. With due respect to the District Court, Your Honor, it's the position of Appellants that the District Court and frankly the Board or the Office got off track in this case when it started focusing in on the stitch patterns involved in this need encasement. As long as I can back up a moment, okay? Sure. I found it very confusing. As I understand it, the plain prior art, which renders this obvious, is that we could have this ELA embodiment which was on stage, right? Yes. Do you agree that the ELA embodiment is prior art here? It's prior art. Yes. Okay, so the ELA embodiment strikes me to have all of the features here except the stitch pattern. The ELA embodiment creates patterns on me that has differential stretch capacity. What's missing from the ELA embodiment other than the stitch pattern? The ELA and Hendrickus pattern are designed not to form impressions on the meat, but to create a smooth surface over the meat. The ELA embodiment creates impressions on the meat, doesn't it? It can, but it's not designed to do so. Well, what difference does it make if it's designed to do so if it doesn't? Well, I don't know. Your Honor, if I could back up still further in this case. In the specification itself, what we have here is the integration of a stockinette and a net, a netting arrangement. The specification itself states that for years, and the prior art demonstrates that for more than 50 years, people were taking the stockinette, pulling it over the meat, and then in a separate set, pulling a netting arrangement over the meat. So what we have there is we have the two components of the 148 patents, if you will, integrated in the ELA embodiment, right? So that's integration, but those veins around the circumference of the tube, if you will, were there to create, again, to form a resistance and to create a smooth surface over the meat, not to create a pattern on the meat. It did create a pattern on the meat. Pardon me? It did create a pattern on the meat. Your Honor, the mince himself testified to that, correct? I believe Mr. Mince testified that it could create a pattern on the meat. But that's not what it was designed for, and that's, again, I believe, Your Honor, that that's not the point here. It's not the creation of impressions on the meat that is the patentable invention in this case. The patentable invention is the integration of the two. It creates feelability, right? Yes, it allows for better feelability. ELA did that, right? That's correct. So what's the difference other than the pattern between the ELA embodiment and what's claimed here? Other than the pattern that is created? Yes. On the meat? No. Well, there is a big difference. Because the pattern that people were looking for was a pattern that everybody had come to describe as the old world style with this checkerboard arrangement on the outside of the meat that was created by people simply twining or winding the meat with a netting arrangement, if you will. It's a netting arrangement that's weighted one strand at a time. Here, we've created that integrated product that has differential stretch capacities. The patent calls for that. There's nothing in the record. That is true in ELA, too, differential stretch capacities, right? It was for a different purpose, though, Your Honor. It was for reinforcement as opposed to creating a pattern that when you pulled off the encasement itself, left that pattern on there without tearing the meat. Meat testified that the ELA embodiment did that, right? That it allowed it to peel off. That's only because of the stockinette, Your Honor, rather than because of the reinforcing bands around the outside. All of the products that use a stockinette have that peelability. That's why they were using it in a two-part step for more than 50 years. People were looking at the knitted netting arrangement and the knitted stockinette, and they were using them separately, paying for each component separately. And then, with all this prior record before the patent office, the Sartori patent talks about using the ELA before the patent office. No, the ELA was not before the patent office, Your Honor. But the Sartori patent, if you go back to 1924, I believe, when that patent was issued, it talks about an encasement, a smooth encasement, and then putting the netting arrangement over the top of it. And the whole innovation there is the two-part process versus the one-part process. Here, less is definitely more, insofar as it's cheaper to buy the structures itself and less expensive to implement in that it's just a one-step process. You don't need to run something through a second line in order to get this pattern on the meat and be able to preserve it when you peel it off. And that's the difference that was scaring everybody in the face, the desirability of the pattern and the desirability of the smooth peelability. That was something that was needed up until today. It's been desirable for more than 100 years. And people were looking at these two knitted products, one on top of the other, and nobody had the realization that the two could be integrated and knitted in such a wonderful way. Is ELA in the district court's opinion? No. I don't believe it was talked about. So there's no decision based on that? That would be correct, yes. Did the district court consider the secondary considerations? No, it did not. The district court specifically stated that, in its opinion, that it did not appear that plaintiffs or appellants had stepped forth without any secondary consideration or evidence of non-obviousness. Whereas, in our brief itself, we have more than six pages devoted to that topic alone. All the secondary considerations depend on peelability being safe, right? I don't know that that was a secondary consideration. No, but the commercial success is due to peelability in part, right? I think the peelability was already there in a two-step process and could be obtained. And again, this is where I come back to the losses more. This is an advertising task, peelability, right? Sure. Absolutely. So you haven't shown that the commercial success is due to this clear pattern as opposed to the peelability, with the peelability being ELA and violence, right? The commercial success was shown in the fact that we were selling and selling and selling, and it became our overwhelming product. Selling and selling and selling by touting peelability. We touted peelability. We touted the square pattern. We touted the fact that you could get exactly what you see. How can we separate the commercial success due to peelability, which was in ELA, as opposed to the square pattern, which wasn't? Peelability was there in the prior all along. Peelability was something that was a given that manufacturers weren't going to go without. This is another way of getting there, and that is by knitting in the netting arrangement into the stockinette. And that's not what was done with ELA. ELA, I believe, were reinforcing bands that may have even been elastic going around the outside, the outside circumferably. But, again, it's an unusual situation here where the invention is taking something that was two parts and making it only one part out of the same material, if you will. And that resulted in a commercial success of being a less costly product, so they could dominate the market. That combination was present in ELA. Now, it wasn't wrong. There was nothing knitted into the ELA. It was those bands going around the outside that just gave added pressure that allowed them to stuff the meat into the sausage, if you will, into the casing harder and still have peelability and still have all the benefits that the industry demanded. This is an industry that does not change quickly, and if something is desirable, people aren't going to start putting a different pattern on it or doing things in a radically different way, even if it is less expensive. Here, they got the same product, but were able to do it in a less expensive fashion. And that's something that is not taught by the ELA prior art in any way. It's not taught by any of the prior art that's out there. Even Sartori, that had both components, taught it in two steps. It allows you to take the casing and put it inside the netting arrangement and then stuff the casing. That's what Sartori was about. The difference here, again, is the integration. You didn't have to have that separate step of putting the netting arrangement inside the casing before you go through the stuffing process, if you will. I see no rebuttal times for anything. Yes, sir. Thank you. Mr. Hengartner? Good morning, Your Honor. John Hengartner on behalf of the Assembly. Your Honor, I think Judge Dyke has hit it exactly correctly. The ELA Where is ELA any part of this decision? We're reviewing a decision of the district court. Show me. I've got it right here in front of me where there's any discussion of ELA. Your Honor, I think there's two things I'll make in response to that. The first is that ELA was in the evidence that was submitted to the district court. It was in the record on the motions for summary hearing. Where is it here in the decision? Well, ELA is an actual implementation of Henricus. So in the decision, the court talks about Henricus. It does not talk about ELA. And I agree with you, Your Honor. There's no direct reference to ELA in this. But as Mr. Leath testified How do we make a decision on something that there was no decision on? Well, Your Honor, I don't think we have to. Because the decision is the district court review the objective criteria of obviousness at all. Or did it in fact say they don't appear to offer any when in fact they'd offer six stages? Your Honor, two points on that. The court said it did not find any objective indicators of non-obviousness. When you look in the context of the decision on reconsideration, the court very clearly is faced with that issue. That issue was pressed directly on reconsideration. And the court said, first of all, I'm not going to look at the new evidence of non-obviousness that you're now putting in front of me that wasn't there before. And secondly, I understood the ground factors. I took them all into account properly. And I reached my decision. In that context, I think it's proper to read the underlying decision, the original decision, as saying that it had looked at the information and found no objective indicators of non-obviousness. On this issue, I want to point out one thing, too, because I think it's important for the record. On page 10 of the reply brief of the appellant, they cite to the alleged evidence of non-obviousness. Among that, they cite extensively to an expert report of Mr. Neal Mintz, which was struck by the district court and completely filled in the cake. The order striking that report was July 9, 2009, and is in the record, appendix 4534, 4535. The court has no place in this appeal. He cited extensively in the reply brief on precisely this issue. With what's left of this alleged evidence, first of all, I quote, as I indicated before, that it did consider these factors, although it didn't outline its analysis of them and found them not to be objective indicators of non-obviousness. In addition, as Judge Stipe indicated, the commercial success is an example. If there's any discussion of the commercial success, and there is no real objective evidence off of that other than a statement that it was commercially successful. But you've got to consider it before you can start looking for nexuses or non-nexuses, don't you? Absolutely. I understand. And I don't see any evidence that this was even considered. Even when it was brought to them on reconsideration, the district court refuses to consider it when it's offered a second time. And our law says you have to consider it. You have to do something with it. I read the order on reconsideration indicating that the court had considered it. Obviously, it would be better if the court had disclosed its analysis and laid that out to this court. But in its decision, I think the district court made quite clear we looked at it, but we found nothing there. Can we send it back and have them consider it this time? I don't believe so, Your Honor, for a couple of reasons. First of all, it's looking at— It's back to look at ELA, too? I mean, I'm looking at the district court's opinion. Henricus Sartore, Lombardi, Irner, Bradshaw. Those are the pieces of prior art that are considered. Brad Saul, excuse me. And there's some analysis throughout, three pages on that. I don't see any ELA. Absolutely, Your Honor. And as I started to indicate, ELA is, as Mr. Reed testified at length, is an embodiment of the Henricus— Yeah, but I don't think that does it for you. I think you've got to— They admit that ELA is prior art. I think that Henricus standing alone doesn't do that much for you. But ELA is very close to this, other than the Fish Ban. And the question is—I mean, it is summary judgment. It is the noble review. The question is, should we do the job that perhaps should be done at the district court or should we send it back to have the district court do the job that needed to be done in considering ELA and maybe articulating more clearly why the secondary evidence wasn't significant? Your Honor, given the time that this case has already been pending, it's far more efficient for this court to exercise its authority and make what it believes is the correct decision using the correct— We don't make decisions. We review decisions. And the noble review, it's my understanding, this court has the authority to take that step and make the determination— No, no, no, we don't. We don't have the right to make any factual findings. And we're asking this to make a factual finding that ELA is prior art, that it is pertinent, that a person of skill in the art would have come and bind it with Henricus. There's three factual findings you're asking us to make right there, and we don't do facts. Your Honor, I'm asking this court to consider Henricus and all of the other prior art of record in evaluating the district court's decision. And if the court believes that ELA is relevant to that, it's my understanding this court has authority to consider it in making that decision. Now— But not find facts. But not find facts. I'm not suggesting this court should find facts. But you're telling us we have to find at least those three facts to get ELA to handle the case. Your Honor, the facts that we're talking about here don't need to be found by this court. These facts have been— They're not part of the district court, so they're not part of what we're doing. Understood. And if it needs to go to district court to determine that these are undisputed facts, I mean, this means the testimony is quite clear. Procedurally, however, the Respondent's position is that there is adequate evidence in the prior art that was cited by the district court to reach the same conclusion, that the prior art clearly disclosed an integrated structure, and there was no question that the Henricus reference shows a plain stock in that background with reinforcing strands that are knit in, and the detailed drawings show exactly how it is knit into that structure. So it is an integrated structure. It clearly has different stretch capacities, because the purpose of those restricting bands is to hold the stock in it together and not let it continue to extend. But it has the keelability characteristics. It has everything except for the stitch pattern. And those stitch patterns have been known in the knitting industry since at least back to Herman without question that this pattern of stitches and aligning these long loops was well understood to make a grid pattern. In the time of the development of circular knitting over nearly 100 years, no one had come up with a better way to make these grid patterns. It was aligning these long loops and locking them together. I think it's also important, since we're talking here about potential agreement in this case, to talk about the infringement side of this case, because the finding of non-infringement in this case is heavily discussed here. There's simply no evidence put forward to establish infringement. There's only one thing that issues in this case. It is Claim 1. There is never in this case, in response to the summary judgment motions, in the appellant's own summary judgment motions, never is there an application of Claim 1, the elements of Claim 1, to any of the accused products of which there are a variety of different specific structures of nets. In the court, we find, and I think it's instructive to actually look at, that we throw the drawings in the brief, and provided the district court the samples, there are drawings of the BBN net, which we found interrupted on our site. And those drawings show the structure of the BBN net having a substantial number of rows of regular loops between the longitudinally extending long loops. This is a structure that was expressly disclaimed in the file history by JFFAC. In order to distinguish Lombardi, the applicant specifically said, our difference is we don't have a row of regular loops between our lines, long loops. Therefore, we're amending our claim to do two things. In Claim 1, we're going to require that each longitudinal strand and each lateral strand intersect in locking engagement with one another. The district court granted actually their construction of the term locking engagement, so that they need to fix at each intersection where those strands intersect has to be fixed. When it looks at this net, when it looks at this structure, it found two things, and the district court says this. The applicant specifically disclaimed this structure because the accused products all have at least one row of regular loops between the longitudinal strands and the lateral strands. And moreover, it looked at the net and said with that structure, it's not fixed at the intersection. There are gaps. It's spread. The structure does not create rectangles, four-sided shapes. And this was, there was no factual dispute over this because there's no reason the jury could find that this is the case. But this is intersecting and locking engagement. There's just too much play at those points. It is not fixed. That's the accused device? This is one example of the accused device. This is called the BPN netting, and I can provide the citation. I haven't been throwing my notes for the actual structure that's shown for this net. If the court has any other questions, I'll be happy to answer those. Otherwise, I don't think I have further to add. Thank you, Mr. Gardner. Thank you. Mr. Anderson, their products do seem to be quite on line with Lombardi, which is prior art. I would respectfully disagree, Your Honor. The Lombardi pattern was dealing with a method for creating patterns on a fabric. It had nothing to do with creating impressions on meat or being part of a meat encasement. They're both knitted, that's true. But this is a different field of art, and just being able to create a pattern on the fabric is something different than being able to create a structure within. But there isn't a pattern on the locking engagement, as counsel has said. No, there isn't, Your Honor, because the counsel and what the court focused on were the loops that make up the strands of the net. The net is made up of strands going longitudinally and laterally. Those strands are made up of loops of different patterns, and there's no description in plain world as to what loops or what type of stitch patterns need to be made. The bottom line is that the structure created by both the BBN net and all of the accused products in this case, structures created by those loops create strands. The district court's construction of a strand is simply the threads or yarns, yarn or yarns, that make up the lateral and longitudinal structures of the netting arrangement. So even if there is a gap or they're making their intersection a little broader than it would be with just one or two rows of yarns, the fact that those strands don't move past each other, they could get, but they aren't fixed at that intersection, and that is all that is required of the claimant. You're saying, by fix, you're saying that they are unlocking engagement and therefore there is no need to discuss it before the district court? Well, we discussed it at length and in our briefs, but the hearing in this case focused only on obviousness and we never got to infringement to the length of the transcript. So we pointed it out in our briefs and we pointed out that each one of the accused products, no matter what stitch pattern they used, they're creating these strands and the reason is that they were creating... How is their product different from the one that you distinguished from the prosecution this time? How is it different? The Lombardi patent that was distinguished in the prosecution's history, again, was the patent dealing with fox. But you yourself stipulated, you asked that someone skilled in the art be a person of ordinary skill and well in the arts, have a high school education, a one-year experience working in the knitting industry. So having recognized the relevance of the knitting industry in your own proposed definition of someone skilled in the art, how can you now dismiss it and say it's irrelevant? Well, I'm not sure that was our proposed definition, Your Honor. That was a definition that we accepted. So I would say no to your plain construction brief. Pardon me? It was in your plain construction brief. That's right. From the very outset, Your Honor, and after the motion for preliminary injunction, we argued very vigorously that the person of ordinary skill in the art had to have experience both in the meat and cheese industry and in the knitting industry. We changed your mind. Pardon me? Changed your mind. We changed our position, Your Honor. Yes. But we didn't, we accepted it. We didn't argue it on the motion for summary judgment because the preliminary injunction hearing was just a few months earlier than that recording, recently giving us a ruling with respect to who a person of ordinary skill in the art might be. And I've run out of time. Thank you, Mr. Anders. Our next case is Amstein v. United States. Mr. Stanton? Yes, good morning, Your Honor. And may it please the Court, my name is Jim Stanton and I'm here to represent Keith Amstein v. United States. And...